UNITED STATES of America,
Plaintiff–Appellee,

v.

Alan James DRING,
Defendant–Appellant.

No. 89–10250.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 11, 1990.

Decided April 4, 1991.

Alvin H. Goldstein, Jr., and James M. Braden, Goldstein & Phillips, San Francisco, Cal., for defendant-appellant.

Dennis Michael Nerney, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before CHOY, FARRIS, and THOMPSON, Circuit Judges.

CHOY, Circuit Judge:

## OVERVIEW

Alan J. Dring was convicted of importing marijuana, possession with intent to distribute, and related conspiracy charges. On appeal, Dring alleges that the district court erred by (1) barring presentation of evidence regarding his truthful character; (2) allowing in-court identification of Dring by three witnesses, each of whom initially had been shown but a single photograph of Dring; and (3) failing to dismiss the indictment because the Government deported eleven alien eyewitnesses before Dring could interview them. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 2:30 a.m. on May 22, 1986, a fishing boat carrying 13,000 pounds of marijuana, docked at Pier 3 in San Francisco Harbor. The marijuana had been transferred to the fishing boat a few miles offshore from a larger vessel, the Panamco II.

The Panamco II was owned by Harold Speer, alias Robert L. Lawrence. Dring had performed extensive repairs and outfitting work on the Panamco II for Speer. Dring had done this work free of charge, with Speer only paying Dring's expenses for trips to drydocks in Mexico, Thailand, and Malaysia.

Stationed aboard the fishing boat and on the pier were undercover United States Customs agents, who witnessed the unloading of the marijuana. The agents saw an unidentified white male step out of a blue pickup truck parked on the pier. He opened the back of a large tractor-trailer and spoke broken Spanish to the occupants, eleven illegal aliens from Mexico. He supervised the transfer of the marijuana from the boat to the trailer.

During the unloading, Mark Lawrence, the caretaker of a tugboat docked at Pier 3, went over to investigate the early morning events. He talked for a moment with the man from the blue pickup truck and then left. After the unloading had been completed, the agents followed the tractor-trailer and apprehended its driver, Michael Thompson, as well as the eleven illegal aliens. The agents handed the aliens over to the Immigration and Naturalization Service (INS). Before deporting the aliens to Mexico, the INS recorded their names and cities or states of residence.

Meanwhile, other agents lost track of the blue pickup, but found it again, twenty minutes later, parked in front of Dring's part-time residence on Pier 9. The engine was still warm. A Department of Motor Vehicles' check of the license number showed Dring to be the registered owner. The agents knocked on the door of the residence, but received no response.

Within two weeks, agents Gallion, Bruns, and Bastan were shown a single photograph of Dring. Bruns was told that it was a photograph of the man on the pier. At an evidentiary hearing, the district court decided to permit agents Gallion and Bastan to make in-court identifications of Dring. On the basis of *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972), the district court ruled that the initial pretrial identifications had been reliable.

At trial, the Government presented considerable circumstantial evidence and five eyewitnesses who placed Dring at the pier that night. All five witnesses—the three agents, Thompson, and Leroy Ludahl, the captain of the fishing boat—had identified Dring from photographic arrays in late 1988 or early 1989. To Dring's surprise, defense witness agent Echoff, also identified Dring as the driver of the blue pickup.

Dring presented a defense of mistaken identity. Mark Lawrence, the tugboat caretaker who lived on Pier 3, testified that Dring was not the man he had spoken to on the pier. Two alibi witnesses testified that Dring had spent the night in question at his home in Napa Valley. Finally, Dring took the stand and denied any involvement in the drug-smuggling operation.

The Government attacked Dring's defense with contradiction evidence and one rebuttal witness. The district court precluded Dring from introducing character evidence of his veracity and denied Dring's pretrial motion to dismiss his indictment.

## I. EVIDENCE OF DRING'S TRUTHFUL CHARACTER

■ Dring argues that the district court erred by barring the introduction of evidence as to his truthful character. The question before this court is a mixed question of law and fact, wherein matters of law predominate. We review it *de novo*. *United States v. Owens*, 789 F.2d 750, 753 (9th Cir.1986), (citing *United States v. McConney*, 728 F.2d 1195, 1202–04 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)), *rev'd on other grounds*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

Federal Rule of Evidence 608(a)(2) provides that "[e]vidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." Dring concedes that the Government did not use opinion or reputation evidence against him, but still maintains that the Government "otherwise" attacked his character for truthfulness.[1]

The first exchange cited by Dring was the response of a Government witness to cross-examination by Dring's counsel. We hold that defense-initiated "attacks" on the character of a defense witness do not trigger rehabilitative testimony under Rule 608(a). To hold otherwise would enable defense attorneys to manufacture attacks on the truthful character of their own witnesses.

■ The other statements cited by Dring are also insufficient to trigger rehabilitative testimony. The purpose of Rule 608(a)(2) is to encourage direct attacks on a witness's veracity in the instant case and to discourage peripheral attacks on a witness's general character for truthfulness.[2]

1. Dring argues that the following exchanges constituted Government attacks on his character for truthfulness:

Q [by defense counsel]: But since Mr. Dring was offering this as an explanation of his whereabouts on May 21, you certainly wanted to talk to ... Chilly George to confirm it, didn't you?

A [by Agent MacKenzie]: I felt that in the future, that if we wanted to talk to Mr. Chilly George, we could probably chase him down by asking Mr. Dring, but at that time I thought he was not telling us the truth. I did not pursue it.

. . . .

Q [by prosecution to Dring]: Now, when Mr. MacKenzie and Mr. Landry spoke to you about the evening of May 21st and the morning of May 22nd, 1986, you did not tell them the truth, did you?

. . . .

Q [by prosecution]: If I understand your testimony, the six people that testified in court and identified you as being on Pier 3, they're all mistaken, is that correct?

A [by Dring]: Yes, sir.

Q: It wasn't you?

A: No, sir, it was not me.

. . . .

Q [by prosecution]: In January 1986, did you tell Mr. Borgen that you might be in some trouble and might need an alibi?

A [by Dring]: I told him what was happening to me.

Q: Well, did you tell him in '86 that you might be in trouble and might need an alibi?

A: I told him what was happening to me.

Dring also argues that the Government attacked his character for truthfulness in its closing and rebuttal arguments:

And I submit the evidence is clear and convincing that the defendant lied. Not just about a little thing, he lied about a lot....

. . . .

I'll tell you what it adds up to.... A man who will put up a false and perjured defense. Now, I guess it was bad form of me, according to Mr. Goldstein, to suggest that Mr. Dring was not telling the truth. Well, that's what criminal trials are all about, they're a search for the truth.

The Government attorney concluded by saying that Dring had presented "a false alibi."

2. The Advisory Committee's Note to Rule 608(a) states that "[c]haracter evidence in support of credibility is admissible under the rule only

To this end, the Rule prohibits rehabilitation by character evidence of truthfulness after direct attacks on a witness's veracity in the instant case. However, the Rule permits rehabilitation after indirect attacks on a witness's general character for truthfulness.

The Advisory Committee's Note to Rule 608(a) provides that "[o]pinion or reputation that the witness is untruthful specifically qualifies as an attack under the rule, and evidence of misconduct, including conviction of crime, and of corruption [3] also fall within this category. Evidence of bias or interest does not. McCormick § 49; 4 Wigmore §§ 1106, 1107. *Whether evidence in the form of contradiction is an attack upon the character of the witness must depend upon the circumstances.* McCormick § 49. Cf. 4 Wigmore §§ 1108, 1109." (emphasis added).

■ Thus, evidence of a witness's bias for or against a party in the instant case, or evidence of a witness's interest in the outcome of the instant case, constitutes a direct attack that does not trigger rehabilitation under Rule 608(a). For example, it would be permissible to imply that, because of *bias* due to *family relationship*, a father is lying to protect his son. McCormick § 49 at 117 & n. 10 (3d ed. 1984). Such

evidence directly undermines the veracity and credibility of the witness in the instant case, without implicating the witness as a liar in general. By way of contrast, indirect attacks on truthfulness include opinion evidence, reputation evidence, and evidence of corruption, which require the jury to infer that the witness is lying at present, simply because he has lied often in the past.[4]

■ It is for the trial court, exercising its discretion, to determine whether given conduct constitutes a direct or indirect attack on a witness's character for truthfulness. On the one hand, the presentation of contradiction evidence, in the form of contravening testimony by other witnesses, does not trigger rehabilitation.[5] *United States v. Thomas,* 768 F.2d 611, 618 (5th Cir.1985); *see also Homan v. United States,* 279 F.2d 767, 772 (8th Cir.) (federal common law), *cert. denied,* 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960). Vigorous cross-examination, including close questioning of a witness about his version of the facts and pointing out inconsistencies with the testimony of other witnesses, does not necessarily trigger rehabilitation. *United States v. Jackson,* 588 F.2d 1046, 1055 (5th Cir.), *cert. denied,* 442 U.S. 941, 99 S.Ct.

after the witness' character has first been attacked, as has been the case at common law. Maguire, Weinstein, et al., Cases on Evidence 295 (5th ed. 1965); McCormick § 49, p. 105; 4 Wigmore § 1104. The enormous needless consumption of time which a contrary practice would entail justifies the limitation." Analogously, by admitting character evidence only pertaining to truthfulness, "the result [of Rule 608(a)] is to sharpen relevancy, to reduce surprise, waste of time, and confusion, and to make the lot of the witness somewhat less unattractive. McCormick § 44."

3. "Evidence of corruption," refers to evidence of prior corrupt conduct including but not limited to forgery, fraud, perjury, bribery, false pretenses, cheating, and embezzlement. *United States v. Medical Therapy Sciences, Inc.,* 583 F.2d 36, 40–41 (2d Cir.1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979); 3 Weinstein, ¶ 608[05] at 608–45 (enumerating crimes indicating lack of truthfulness under Rule 608(b)).

4. On occasion, a single piece of evidence may serve a dual purpose, both as evidence of bias

and corruption. *Medical Therapy,* 583 F.2d at 41; McCormick, § 49 at 117 n. 9 (citing *People v. Ah Fat,* 48 Cal. 61, 64 (1874) (evidence that state's witness had offered to identify killer "if there was any coin in it"), and *Rodriguez v. State,* 165 Tex.Crim. 179), 305 S.W.2d 350 (Tex. Crim.App.1957) (evidence that witness conspired to falsely accuse defendant)). We need not decide whether evidence of this dual nature triggers rehabilitation under Rule 608(a).

5. By calling the jury's attention to inconsistencies in testimony, the attorney may simply intend to question the ability of the witness to perceive or recall certain facts due to excitement, fatigue, poor eyesight, poor lighting, great distance from the event in question, or fading memory affected by the passage of time. 4 Wigmore, Evidence § 1109 (Chadbourn rev. 1972).

Even where an attorney points out inconsistencies to attack a witness's *truthfulness,* the attack is direct and relevant because it focuses on the credibility of the witness *in the present case* without relying on prior acts of corruption or bad character.

2882, 61 L.Ed.2d 310 (1979). Nor is rehabilitation in order when an attorney maintains in her closing argument that a witness's testimony is not credible, given inconsistencies with other witnesses' testimony. *United States v. Danehy,* 680 F.2d 1311, 1314 (11th Cir.1982).

■ On the other hand, "[a] slashing cross-examination may carry strong accusations of misconduct and bad character, which the witness's denial will not remove from the jury's mind. If the judge considers that fairness requires it, he may permit evidence of good character, a mild palliative for the rankle of insinuation by such cross-examination." McCormick § 49 at 117.

Thus, vigorous cross-examination or the presentation of contradiction evidence can and should trigger rehabilitation where such evidence amounts to the kind of indirect attack on truthfulness embodied by "evidence of bad reputation, bad opinion of character for truthfulness, conviction of crime, or eliciting from the witness on cross-examination acknowledgment of misconduct which has not resulted in conviction." McCormick, § 49 at 116–17.

In this light, the statements cited by Dring constituted direct attacks on Dring's credibility in the instant case. The Government did not introduce opinion or reputation testimony to attack Dring's general character for truthfulness.[6] Nor did it present evidence of prior misconduct or corruption. The Government merely emphasized inconsistencies between Dring's testimony and that of other witnesses. It observed that Dring, a criminal defendant testifying on his own behalf, had a distinct pro-defense bias and a compelling interest in the outcome of the case. Therefore, the district court's denial of rehabilitative testimony was proper.

## II. PRETRIAL PHOTO IDENTIFICATION OF DRING

■ The district court permitted three agents to identify Dring in court. Dring challenges this ruling because, prior to trial, the agents were initially shown but a single photograph of him before they positively identified him as the man in the blue pickup. He argues that this pretrial photo identification procedure was unduly suggestive and prejudicially tainted the agents' in-court testimony.

Dring argues that, under *United States v. Givens,* 767 F.2d 574, 580 (9th Cir.), *cert. denied,* 474 U.S. 953, 106 S.Ct. 321, 88 L.Ed.2d 304 (1985), this court must review the tainted out-of-court pretrial photo identification procedure *de novo.* The Government argues that, under *United States v. Gregory,* 891 F.2d 732, 734 (9th Cir.1989), the district court's evidentiary ruling is only subject to review for abuse of discretion. *But see United States v. Domina,* 784 F.2d 1361, 1369 (9th Cir.1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987) (abuse of discretion applies only where allegedly tainted identification procedures were initially conducted in-court).

■ We need not resolve this dispute because, under either standard of review, the Government prevails. For both in-court and out-of-court identification cases, we apply the five-factor totality of the circumstances test set forth in *Neil v. Biggers,* 409 U.S. 188, 200–01, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972). *United States v. Field,* 625 F.2d 862, 867 (9th Cir.1980). Under this test, we must consider: (1) The opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certain-

---

**6.** Contrary to *United States v. Lechoco,* 542 F.2d 84, 86–89 & n. 6 (D.C.Cir.1976), and *United States v. Everage,* 19 M.J. 189 (C.M.A.1985) (construing substantially similar wording of Military Rule of Evidence 608(a)), it is not merely attacks on *truthfulness* which trigger rehabilitation, but rather attacks on a witness's prior history or general *character for truthfulness.*

Far from attempting to prove that Dring was generally a liar, the Government merely suggested that Dring was lying in the instant case about his degree of involvement in the crime. The Government placed Dring's veracity in the instant case at issue, but not his reputation for veracity.

ty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

■ Reliability of a witness's initial identification is the key to its admissibility. *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Assuming that the showing of the single photograph to agents Gallion, Bruns, and Bastan was unduly suggestive, their in-court identifications of Dring were admissible because they were "nonetheless reliable" under the totality of the circumstances. *Gregory,* 891 F.2d at 734.

The agents were trained professionals, expert at observing criminals, and each agent had a good opportunity to view the person on the pier during the night in question. As in *Brathwaite,* the passage of only two weeks before agents Bruns, Bastan, and Gallion viewed Dring's photograph favors the Government. There is little concern that the agents' minds were especially prone to undue suggestion from the passage of time. *Brathwaite,* 432 U.S. at 115–16, 97 S.Ct. at 2253–54. There is no evidence that the agents felt pressure to make a positive identification at that time.

One element that detracts from the reliability of the agents' eyewitness testimony was that none of the agents mentioned in their initial reports that Dring had worn a beard. It was possible, however, that the man had worn his coat buttoned-up around his neck, partially obscuring his beard. Gallion and Bastan did not think the single photograph was a good likeness of the man they had seen on the pier. That the agents could discern the photograph to be a poor

likeness of Dring indicates that they had a firm conception of how the man on the pier looked. *See United States ex rel. Kosik v. Napoli,* 814 F.2d 1151, 1159 (7th Cir.1987) (witness's failure to identify criminal defendant in lineup did not undermine previous identification because defendant's looks had changed significantly during the interim).

## III. DEPORTATION OF ILLEGAL ALIEN EYEWITNESSES

■ Dring argues that the Government's deportation of the eleven alien eyewitnesses violated his fifth amendment right to due process and his sixth amendment right to compulsory process. In cases of constitutionally guaranteed access to evidence, wherein the Government loses potentially exculpatory evidence, the Supreme Court applies a two-pronged test of bad faith and prejudice. In *United States v. Valenzuela–Bernal,* 458 U.S. 858, 866–67, 102 S.Ct. 3440, 3445–46, 73 L.Ed.2d 1193 (1982), the Court applied this two-pronged test and rejected the "conceivable benefit" test of *United States v. Valenzuela–Bernal,* 647 F.2d 72, 73–75 (9th Cir. 1981).

Under this two-pronged test, the defendant must make an initial showing that the Government acted in bad faith *and* that this conduct resulted in prejudice to the defendant's case.[7] To prevail under the prejudice prong, the defendant must at least make "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his

---

7. In *Arizona v. Youngblood,* 488 U.S. 51, 55–57, 109 S.Ct. 333, 336–337, 102 L.Ed.2d 281 (1988), the Court reviewed cases involving "constitutionally guaranteed access to evidence." In *California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984), *Killian v. United States,* 368 U.S. 231, 242–43, 82 S.Ct. 302, 308–309, 7 L.Ed.2d 256 (1961), and *Valenzuela,* 458 U.S. at 872–73, 102 S.Ct. at 3449, the Court applied a test in which it determined whether the defendant had proved both prejudice *and* bad faith. In *United States v. Lovasco,* 431 U.S. 783, 789–90, 97 S.Ct. 2044, 2048–2049, 52 L.Ed.2d 752 (1977), the Court stated that proof of prejudice was necessary, but not sufficient, to establish a due process claim. The

Court concluded that there was no evidence of bad faith pre-indictment delay. *Id.* at 795 & n. 17, 796, 97 S.Ct. at 2051 & n. 17, 2052.

*Youngblood* and its predecessor access cases involved the loss of *potentially exculpatory evidence.* Thus, the question of bad faith was essential to the Court's inquiry. *Youngblood,* 488 U.S. at 57, 109 S.Ct. at 337. By way of contrast, in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Government failed to disclose *evidence which it knew to be exculpatory.* Thus, the question of bad faith was irrelevant. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196.

defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela*, 458 U.S. at 873, 102 S.Ct. at 3449.

 Dring asserts that under *Valenzuela*, the Government must make an initial showing that the deportations were effected in "good faith." If the Government failed to detain and interview the witnesses, Dring contends, we must presume prejudice to his defense. We agree with the Government that it is the criminal defendant who bears the burden of proving that the Government acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 55, 58, 109 S.Ct. 333, 336, 337, 102 L.Ed.2d 281 (1988).[8]

In support of his argument that the Government must prove good faith, Dring points to the Court's statement in *Valenzuela*, 458 U.S. at 872, 102 S.Ct. at 3449, that "the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution."

According to Dring, this language indicates that the Government may deport aliens *if and only if* it first questions them, or otherwise makes a good faith determination that they are not material and favorable eyewitnesses. In fact, this merely indicates that, in *Valenzuela*, the Government was able to prove good faith, thus rendering irrelevant any showing of prejudice by the defendant. This language does not establish a presumption that the Government acted in bad faith. Nor does it require the Government to make an initial showing of good faith.[9]

As the court observed in *Valenzuela*, 458 U.S. at 872–73, 102 S.Ct. at 3449, "[t]he mere fact that the Government deports such witnesses is not sufficient to establish

a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment. A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense."

In *Valenzuela*, the defendant failed to prove prejudice. Although the Court deemed "some showing" of prejudice to be necessary, it neither stated nor implied that a showing of prejudice would have been sufficient to satisfy the good faith prong. *Id.* We find it significant that the Court emphasized the Government's good faith conduct, implying that the defendant would have been unable to satisfy the additional and separate requirement of proving bad faith. *Id.* at 872, 102 S.Ct. at 3449.

In *Valenzuela*, 458 U.S. at 870, 102 S.Ct. at 3448, the Court acknowledged that the materiality showing in deportation cases necessarily differs from the showing required in *Brady* and *Agurs*, because Valenzuela–Vernal "simply had no access to the [two] witnesses who were deported after he was criminally charged." The Court permitted a relaxation of the specificity required, but was unwilling to dispense altogether with the showing of materiality. It held that "in such circumstances it is of course not possible to make an avowal of *how* a witness might testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." *Id.* at 871, 102 S.Ct. at 3448.

Dring fails to make a plausible showing that the aliens' testimony would have been material to his defense. In *Valenzuela*, 458 U.S. at 873–74, 102 S.Ct. at 3449–50, the Court defined the relevant test of materiality: "As in other cases concerning the

8. In light of *Youngblood, Hilliard v. Spalding,* 719 F.2d 1443 (9th Cir.1983) is no longer good law. In *Hilliard* we held that the prosecution's loss of a potentially exculpatory sperm sample would permit the court to set aside any bad faith inquiry and presume prejudice to a defendant accused of rape.

9. Analogously, a tort plaintiff has the burden of proving negligence. A defendant may offer evidence that she has acted with reasonable care, but the burden remains on the plaintiff to prove an absence of reasonable care.

loss of material evidence, sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *United States v. Bagley,* 473 U.S. 667, 681–82, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1984).

Even assuming, arguendo, that the aliens' testimony would have supported Dring's defense of misidentification, this testimony would not have been material in light of the convincing evidence of Dring's guilt, including the circumstantial evidence of his ongoing involvement in the drug smuggling operation; the fact that his truck was on the pier and then driven to his residence; and the testimony of eyewitnesses who said they had seen him on the pier that night. *See United States v. Winn,* 767 F.2d 527, 529, 531 (9th Cir.1985). Moreover, even if the aliens had been present to testify that Dring was not on the pier, that testimony would merely have been cumulative of the testimony of Mark Lawrence. *United States v. Tafollo–Cardenas,* 897 F.2d 976, 979 (9th Cir.1990).

As did the Court in *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337, we place special emphasis on the bad faith prong: "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.*

In this case, Dring has introduced no evidence that the agents acted in bad faith when they turned the aliens over to the Immigration and Naturalization Service for deportation. Dring has presented no evidence that the Government departed from normal deportation procedures. *Trombetta,* 467 U.S. at 488, 104 S.Ct. at 2533 (police acted "in good faith and in accord with their normal practice"). Dring has made no showing that the Government deported the aliens to gain an unfair tactical advantage over him at trial. *United States v. Marion,* 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971) (no evidence that Government intentionally delayed trial to harass defendant or gain tactical advantage).

AFFIRMED.