**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Horacio VELARDE–GAVARRETE; Bolivar Wilson Guerrero–Mosqueda, Defendants–Appellees.**

**No. 91–50836.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 6, 1992.

Decided Sept. 22, 1992.

David P. Curnow, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellant.

Frank J. Ragen, II, San Diego, Cal., Steven J. Riggs, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendants-appellees.

"Shall be fined not more than $5,000 or imprisoned not more than two years, or both...."

Before: FARRIS, WIGGINS, and FERNANDEZ, Circuit Judges.

FARRIS, Circuit Judge:

The United States appeals the district court's order dismissing the indictment against Horacio Velarde–Gavarrete and Bolivar Wilson Guerrero–Mosqueda. We reverse.

I

At approximately 7:30 a.m. on September 11, 1990, the USS Arkansas, acting on classified information, encountered the M/V Nordcapp, a Honduran-flag freighter. The Nordcapp was dead in the water near the Clipperton Islands, approximately 1400 miles west of Costa Rica. A United States Coast Guard law enforcement team aboard the Arkansas radioed for permission to come aboard the Nordcapp. The Nordcapp denied the request. Minutes later, the request was repeated. This time, permission was granted.

By this time, the Coast Guard team noticed heavy non-engineering smoke coming from the Nordcapp, indicating a fire on board. The team arrived at the Nordcapp and found most of her crew mustered on deck. Because of the fire, the team advised the Nordcapp crew to prepare to abandon ship. The team's efforts to locate the source of fire were hampered by heat and smoke, and no observations were made of the contents of the ship's cargo hold. The team seized some documents and evacuated the Nordcapp crew. By midafternoon, the Nordcapp had sunk in 11,000 feet of water. Efforts to dislodge the contents of the ship's hold were unavailing.

Ten Nordcapp crewmembers were taken aboard the Arkansas. Because of the suspicious nature of the Nordcapp's burning, the Arkansas was ordered to transport the crew to San Diego for interviews and debriefing. The crew, however, was not placed under arrest.

While the Arkansas was en route to San Diego, the Coast Guard team received information from Interpol that Velarde, the Nordcapp's captain, was a fugitive from Belgium, where he had been convicted in absentia for smuggling cocaine by ship. The Belgian government requested Velarde's provisional arrest and extradition.

The Coast Guard team interviewed Velarde. They did not inform Velarde that they were aware of his Belgian conviction. Velarde stated that the Nordcapp was carrying a cargo of clothing when it sank. Other crewmembers were also interviewed about the Nordcapp's sinking. Several of them indicated that they did not know what the Nordcapp was carrying.

The Arkansas arrived at San Diego on September 15. Upon arrival, it was met by representatives of the Coast Guard, the Immigration and Naturalization Service, the Drug Enforcement Agency and United States Customs. All crewmembers were interviewed by law enforcement officers on the day they arrived in port.

Velarde was informed that he had been identified as a fugitive. He then admitted that the Nordcapp was carrying fifteen tons of cocaine. He denied ordering the Nordcapp fired or scuttled. This interview was not taped, but written notes were made soon after. As a result of the interview, Velarde was classified as a Class I drug violator.

Ingmar Gomez–Nieva claimed during his interview that he was a stowaway aboard the Nordcapp, but he later admitted that he was aboard the ship to guard the cocaine. He stated that Velarde knew about the cargo, and that the crew had assisted in loading the cocaine on board. Gomez denied any role in firing or scuttling the ship. This interview was not memorialized until September 28, 1990. As a result of the interview, Gomez was also classified as a Class I drug violator.

The remaining crewmembers were also interviewed, including Guerrero–Mosqueda. All of them denied knowledge of drugs aboard the Nordcapp. All of them denied firing or scuttling the ship.

Initially, the DEA made no attempt to detain the crewmembers based on the information obtained from Velarde and Gomez. The INS informed the DEA that the crewmembers would be repatriated if they were not charged within forty-eight hours. On September 21, seven crewmembers, including Gomez, were repatriated. On September 25, another crewmember, Helicio Gutera was repatriated. Velarde was not repatriated because of the Belgian extradition request. Guerrero was scheduled for repatriation and actually boarded an aircraft to return home, but he was prevented from departing because of a hold arising from information that he was on parole in the United States for an earlier drug smuggling conviction.

The DEA launched its formal investigation on September 24. Along with the United States Attorney's office, the DEA spent the next seven weeks assembling a case, including a request for consent and waiver of objection from the Honduran government to prosecution of Nordcapp crewmembers in the United States. The Honduran government granted the request on November 8, 1990.

On November 15, 1990, an indictment was returned against Velarde and Guerrero. The indictment charged them with (a) conspiracy to possess 15 tons of cocaine on board a vessel with intent to distribute, (b) possession of cocaine on board a vessel with intent to distribute, (c) conspiracy to import cocaine and (d) attempted importation of cocaine.

On April 9, 1991, Velarde and Guerrero moved the district court to dismiss the indictment, on the grounds that the government had deported witnesses who could testify favorably on their behalf. They relied upon *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982).

In June 1991, an investigator for the defense tracked down and interviewed three members of the Nordcapp crew— Alfonso Morales, Carlos Davila–Noriega and Gilberto Robinson–Villagras. Each denied that the Nordcapp was carrying cocaine, and each denied that the ship was intentionally fired or scuttled.

The district court held a dozen hearings on the *Valenzuela–Bernal* motion between July and September 1991. On November 8, 1991, the district court granted the motion to dismiss the indictment. On December 2, 1991, the government attempted to file a motion to reconsider the November 8 order. The district court held a hearing on the motion but concluded that it was improperly brought under the local rules. In order to complete the record on appeal, the district court ordered the motion for reconsideration lodged but not filed. This timely appeal followed.

Velarde and Gomez remain in custody because of the extradition and parole holds.

## II

Questions of law are reviewed *de novo*. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). A district court's findings of fact are reviewed for clear error. *Id.* at 1200 n. 5.

## III

In granting the motion to dismiss the indictment, the district court found as follows:

I do find that the witnesses who were released by the government were material witnesses favorable to the defendants. I do find that the release of those witnesses was prejudicial to the defendants, and although *I cannot find that there was demonstrated a bad faith by the investigators*, there was, in my view, an incredibly incompetent investigation. And I feel that the evidence requires this court to make a conclusion that *there is an absence of good faith.*

At the reconsideration hearing, the district court stated again that he "specifically found that [the government] didn't act in bad faith." The district court nevertheless dismissed the indictment, relying on *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982).

In *Valenzuela–Bernal,* Valenzuela moved to dismiss an indictment charging him with transporting an illegal alien. *Id.* at 861, 102 S.Ct. at 3443. He argued that the government's deportation of two of the five passengers in the car at the time of arrest, before he had an opportunity to interview them, violated his rights to due process and to compulsory process for obtaining favorable witnesses. *Id.*

The *Valenzuela* Court recognized that the government may "find itself confronted with the obligation of prosecuting persons in the position of respondent on criminal charges, and at the same time obligated to deport other persons involved in the event in order to carry out the immigration policies that Congress has enacted." *Id.* at 864, 102 S.Ct. at 3444. The Court cautioned that "[n]o onus ... attache[s] to the Government by reason of its discharge of the obligations imposed upon it by Congress." *Id.* at 866, 102 S.Ct. at 3445. The mere fact that the government had deported illegal alien witnesses upon a good faith determination that they had no material information favorable to Valenzuela was not sufficient to establish a violation of the Compulsory Process or Due Process Clauses. *Id.* at 872–73, 102 S.Ct. at 3449.

In *United States v. Dring,* 930 F.2d 687, 693 (9th Cir.1991) (petition for cert. filed May 11, 1992), we read *Valenzuela* to require a defendant to show that the government acted in bad faith and that the conduct prejudiced the defendant's case "in cases of constitutionally guaranteed access to evidence, wherein the [g]overnment loses potentially exculpatory evidence."

*Dring* requires a finding of bad faith on the part of the government in repatriating all members of the Nordcapp crew other than Velarde and Guerrero.

Velarde and Guerrero would distinguish *Dring.* The government interviewed each crewmember at sea and in San Diego, and each denied knowledge of contraband aboard the Nordcapp. Velarde and Guerrero argue that this demonstrates that the government denied them access to known, "actually exculpatory" evidence.

We reject the distinction between "actually exculpatory" and "potentially exculpatory" as these terms are applied to oral testimony. Oral testimony is always potentially exculpatory before it is given, even if there is reliable indicia as to its likely content. The hazards of cross-examination and credibility assessment are significant. Testimony, before it is given, therefore lacks a fixed quality.

The Second Circuit's decision in *Buie v. Sullivan,* 923 F.2d 10 (2d Cir.1990), is consistent with this analysis. Buie sought to suppress the indictment, arguing that the arrest of a material witness was intentionally timed by the prosecutor to prevent the giving of exculpatory testimony. *Id.* at 10. At the pretrial stage, the prosecutor had knowledge that the witness had exculpated Buie. The prosecutor communicated that information to Buie. *Id.* at 10–11. The court deemed the witness to have only "potentially useful evidence." *Id.* at 12 (quoting *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988)) (internal quotations omitted). The court held that Buie failed to establish bad faith. *Id.*

Velarde and Guerrero rely on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), for their argument that "the government cannot deprive an accused of favorable testimony regardless of possible motivations."

In *Brady,* the sole issue was whether the government's suppression "of [material] evidence favorable to the accused *upon request* violates due process ... irrespective of ... good faith or bad faith." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196 (emphasis added). The *Agurs* Court also considered the prosecution's duty to disclose exculpatory evidence at or before trial. *See Agurs,* 427 U.S. at 107, 96 S.Ct. at 2399. By contrast, whether the prosecution suppressed evidence at or before trial is not in issue here.

*Valenzuela,* as elaborated in *Dring,* requires Velarde and Guerrero to establish bad faith. They failed to do so. We re-

verse the district court's order dismissing the indictment. On remand, the district court should enter an order denying the *Valenzuela* motion and reinstating the indictment. The district court's finding that it cannot say that the government repatriated the Nordcapp crewmembers in bad faith is not clearly erroneous.

REVERSED and REMANDED for entry of an order denying the *Valenzuela* motion and reinstating the indictment.

WIGGINS, Circuit Judge, dissenting.

The case against these defendants is dependent upon proof that there was cocaine in the hold of the M/V Nordcapp. No cocaine was found. All crew members were interrogated after they abandoned ship and were aboard the USS Arkansas. They were interrogated again after arriving in San Diego. The crew members denied knowledge of the presence of any cocaine aboard the Nordcapp. The government promptly deported the crew members, excepting these defendants, within a week after their arrival in San Diego. The defendants were held in custody based upon an extradition request from Belgium, in the case of the captain, and an alleged parole violation, in the case of Guerrero. These defendants were not charged with the present offense until nearly two months later.

Pending trial, investigators employed by the defendants discovered three of the crew members abroad. Each denied that the ship was carrying cocaine. The defendants thereupon made a motion to dismiss the indictment. After full consideration, the trial court granted the motion. On this record, the trial court should be affirmed.

The law to be applied in this case seems relatively clear. The defendants are entitled to present a defense to the charges made against them and in making their defense the defendants are entitled to exculpatory evidence in the possession of the government. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

But, as explained in *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the gov-

ernment also must discharge its duty to return aliens to their country of origin. The performance of this responsibility may in a given case collide with the rights of a defendant to a fair trial. In order to accommodate to this possible tension, if a defendant moves to dismiss an indictment when alien witnesses with exculpatory information are deported, the defendant must show that the government acted in bad faith and must show prejudice, *United States v. Dring*, 930 F.2d 687 (9th Cir. 1991).

Here the government deported at least three witnesses with exculpatory information before charging these defendants. Did it act in "bad faith" in doing so? The trial court said:

"I do find that the witnesses who were released by the government were material witnesses favorable to the defendants. I do find that the release of those witnesses was prejudicial to the defendants, and although I cannot find that there was demonstrated a bad faith by the investigators, there was, in my view, an incredibly incompetent investigation. And I feel that the evidence requires this court to make a conclusion that there is an absence of good faith."

The trial court is a bit ambiguous. It expressly declared the investigators did not act in bad faith, but in the next sentence, finds an absence of good faith. I find this to be a statement of bad faith sufficient to meet the standards of *Dring*. In short, the defendants have made a sufficient showing requiring the affirmance of the district court. The district court may have expressed itself ambiguously but it did not obscure its conviction that the defendants were denied a fair trial.

I vote to affirm.