**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Roberto Raul CARRENO,**
**Defendant–Appellant.**

**No. 02–10464.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 14, 2004.

Filed April 6, 2004.

---

---

Barry J. Portman, and Steven G. Kalar, Federal Public Defender, San Francisco, CA, for appellant Roberto Raul Carreno.

Kevin V. Ryan, Hannah Horsley, Lewis A. Davis, and Michael L. Wang, U.S. Attorney's Office, Oakland, CA, for appellee United States of America.

Before: WALLACE, NOONAN, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge.

This appeal arises out of Roberto Carreno's conviction and seventy-month sentence for criminal violations of 8 U.S.C. § 1324 (alien transportation), 18 U.S.C. § 1203 (hostage taking), and 18 U.S.C. § 371 (conspiracy). We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Carreno raises a number of evidentiary and other claimed errors related to his jury trial. None of these rises to the level of reversible error. In sentencing Carreno to a seventy-month term, the district court imposed a sentence enhancement for creation of substantial risk of death or serious bodily harm under U.S.S.G. § 2L1.1(b)(5). At issue is the degree of risk required to invoke this enhancement. Although no bright line guides our inquiry, we affirm because the district court's articulated reasons for finding a substantial risk are supported by the evidence and fall within the court's sentencing discretion.

## BACKGROUND

### THE HOSTAGE TAKING

This case stems from the police arrest of Carreno and codefendant Jose Flores for transporting illegal aliens from Mexico. Carreno and Flores, van drivers for Olvera Van Tours ("OVT"), reportedly refused to release two young boys to their family, due to a fare dispute, when the van arrived at the boys' final destination in San Rafael, California. Natives of El Salvador, the eight- and ten-year-old boys entered the United States illegally with the help of a smuggler. Their mother, Maria Gomez, who was already living in the United States, arranged for the boys' travel from El Salvador, including their transport in an OVT van from Houston, Texas to San Rafael.

At trial, one of the key issues bearing on the hostage-taking counts was ascertaining what occurred when the van arrived at the San Rafael parking lot where family members had arranged to pick up the boys. No one disputed that the boys' uncle, Jaime Pineda, and their stepfather, Jose Pena, arrived to meet the van, but that the boys nonetheless remained in the van when Carreno later left for Oakland to drop off another passenger. Neither was it disputed that Pineda approached Carreno outside the van and attempted to give him $500 to pay the transit fare; that Carreno informed Pineda that the fare was actually $800; and that Carreno accompanied Pineda to a nearby pay phone where Pineda called the boys' mother to inform her of the fare difference. What was in dispute, however, was what occurred between Carreno and Pineda after it became clear that the family did not have immedi-

ate access to $800 in cash. Carreno claimed that he and the family agreed that Carreno would return with the boys when the family came up with the money. The government contended that Carreno held the children hostage and made it clear that they would be released to their family only as quid pro quo for the full fare.

In any event, after Carreno left San Rafael with the boys, Pena called the police. Maria then called OVT's headquarters in Houston to discuss the situation with Carreno's superiors; she spoke with a man who "reminded her that [the boys] were children to whom something could happen" and pointed out that the children "were male." On the authorities' advice, Maria called Carreno and told him that she had obtained the full fare. When Carreno returned to San Rafael to meet Maria, police arrested him.

## BELATED REPORT OF CARRENO'S THREAT

Another key issue bearing on the hostage-taking counts was whether Carreno threatened the youngest boy, Carlos, as the van left San Rafael. The government interviewed the boys numerous times prior to trial. In an interview that occurred approximately two years after the van trip and after Carlos had already been interviewed five times, Carlos reported for the first time that Carreno had threatened him that, if the family did not come up with the full fare, he would "use [the boys] as girls" or send them back to El Salvador. Whether Carlos made this statement in response to pointed questioning by FBI agents or whether he simply volunteered the statement was a hotly contested issue at trial.

## THE GOVERNMENT'S DEPORTATION OF JESUS SANCHEZ

Despite Carreno's requests to interview all witnesses to the incident, the Immigra-

tion and Naturalization Service deported many of the van passengers after the FBI interviewed them. One of the deported passengers was Jesus Gonzalez Sanchez, who was outside the van smoking when Pineda initially approached Carreno with the $500 fare and potentially within earshot of the contested conversation. The government concedes that, prior to Sanchez's deportation, the government was aware that Sanchez had witnessed something of the conversation. Whether he actually heard the conversation was in dispute. The FBI file from Sanchez's pre-deportation interview, known as a "302," states that "Sanchez believed that there was some disagreement over money." The Sanchez 302 was in the prosecution's files when it requested the INS to refrain from deporting several other witnesses who might be valuable to the case—Sanchez not among them. Despite this somewhat suspect chronology of events, Carreno produced no evidence that Sanchez actually heard the content of the conversation between Pineda and Carreno or that Sanchez's deportation was anything but routine.

At trial, only Carreno and Pineda testified to hearing the conversation that took place outside the van. Several other witnesses testified to what they observed during the conversation. For example, van passenger Loida Perez testified that Pineda looked upset and worried during the conversation. Another van passenger, Efrin Lainez–Miranda, testified that Pineda looked upset during the conversation and that Pineda and Carreno were possibly having an argument.

## PRE–TRIAL RULINGS

Carreno filed multiple pretrial motions and requests related to the government's deportation of Sanchez and Carreno's alleged sexual threat to Carlos, including: 1) a motion to dismiss the indictment under *United States v. Valenzuela–Bernal,*

458 U.S. 858, 872, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), based on the Sanchez deportation; 2) a motion to present evidence regarding the Sanchez deportation; 3) a motion to admit the Sanchez 302 into evidence; 4) a request for a missing witness instruction to counterbalance any prejudice caused by the government's deportation of Sanchez; 5) a motion to exclude Carlos's testimony regarding Carreno's alleged sexual threat during the van ride from San Rafael to Oakland; 6) a request for a "taint" hearing regarding the testimony that he threatened Carlos; 7) a motion to permit expert testimony on child suggestibility to support the defense's theory that Carlos "misremembered" the threat that an OVT employee made to Carlos's mother as a threat that Carreno made to him; and 8) a request for a hearing regarding the defendant's proposed suggestibility expert under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). After numerous hearings, the district court denied these motions and requests.

## SENTENCING

After a jury convicted Carreno of four counts of alien transportation, two counts of hostage taking, and two counts of conspiracy to commit these offenses, the district court sentenced him to a seventy-month term. The district court imposed a three-level enhancement based on its finding that Carreno had "recklessly creat[ed] a substantial risk of death or serious bodily injury to another person," pursuant to U.S.S.G. § 2L1.1(b)(5).

## DISCUSSION

### I. THE GOVERNMENT'S FAILURE TO RETAIN A WITNESS

■ The first issue we address is whether the government's deportation of Sanchez violated Carreno's Fifth and Sixth Amendment rights. We review de novo a district court's denial of a motion to dismiss for failure of the government to retain a witness, and for clear error the district court's underlying factual determinations. *United States v. Gastelum-Almeida*, 298 F.3d 1167, 1174 (9th Cir.2002). We also review de novo the denial of a motion to dismiss an indictment on constitutional grounds. *United States v. Andaverde*, 64 F.3d 1305, 1308–09 (9th Cir.1995).

■ The district court properly invoked the two-prong test from *United States v. Dring*, 930 F.2d 687, 693–94 (9th Cir.1991), to evaluate Carreno's witness deportation claim. The *Dring* test applies "[i]n cases of constitutionally guaranteed access to evidence, wherein the Government loses potentially exculpatory evidence...." *Id.* at 693. *Dring* requires the defendant to "make an initial showing that the Government acted in bad faith *and* that this conduct resulted in prejudice to the defendant's case." *Id.* (emphasis in original). Carreno has not made this showing.

Although we have not charted the precise contours of "bad faith" under *Dring*, we have held that "a negligent failure to ensure a percipient witness' presence does not amount to a finding of bad faith." *United States v. Armenta*, 69 F.3d 304, 307 n. 1 (9th Cir.1995). Carreno makes a strong case that the government's deportation of Sanchez was negligent. After all, Carreno specifically requested to interview the witnesses before their deportation, and the Sanchez 302 should have put the government on notice that Carreno was a potential witness. At a minimum, Carreno would have wanted a chance to interview Sanchez, or at least a chance to take a pass on an interview. As in *Dring*, however, the record is devoid of any suggestion that the government departed from its normal deportation procedures or deported Sanchez "to gain an unfair tactical advantage." *Dring*, 930 F.2d at 695.

We are extremely troubled by the government's oversights in tracking the witnesses and its reliance on inter-agency communication failures to justify a serious prosecutorial error. Nonetheless, Carreno has produced no evidence that the government knew, or even suspected, that Sanchez would testify in Carreno's favor, *see, e.g., Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), or any other evidence that the government's deportation of Sanchez was anything but negligent. Sloppy work, albeit unbecoming, is not tantamount to bad faith.

Carreno argues that we should analyze this claim differently, first evaluating whether the lost testimony is "material" under *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and *Kyles v. Whitley,* 514 U.S. 419, 436–37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). If we determine the evidence is "material," we must reverse the district court under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), regardless of the government's good or bad faith. Only if we determine the evidence is *not* "material" does *Dring* apply. Although Carreno's argument is well-reasoned, it is foreclosed by our decision in *United States v. Velarde–Gavarrete,* 975 F.2d 672 (9th Cir.1992), which clarifies that *Dring*—but not *Brady* or *Bagley*—applies to access-to-evidence claims based on illegal witness deportation.[1]

In *Velarde–Gavarrete,* we evaluated whether the district court correctly dismissed an indictment based on its findings that the government had deported several "material witnesses favorable to the defendants" whose release "was prejudicial to defendants." *Id.* at 674. Despite the district court's materiality finding, we performed no *Brady* analysis, but instead distinguished *Brady* and analyzed the defendant's claims under *Dring. Id.* at 675. Our holding in *Velarde–Gavarrete* binds us to analyze Carreno's claim under *Dring.*

## II. EVIDENTIARY RULINGS AND MISSING WITNESS INSTRUCTION

Carreno argues that the district court erred in refusing to allow him to present evidence regarding the Sanchez deportation, refusing to give a missing witness instruction, and refusing to admit the Sanchez 302 into evidence. He contends that these errors deprived him of his Fifth and Sixth Amendment rights to present favorable evidence, citing *United States v. Scheffer,* 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). We disagree. The district court committed no error, constitutional or otherwise, in these decisions.

■ Exercising its discretion under Federal Rule of Evidence 403, the district court properly denied Carreno's request for permission to argue that Sanchez "heard any statement or is impartial in any way to support a theory of defense that would suggest that the government is remiss in not having him present" on the grounds that the prejudicial effect of such statements outweighed their probative value. Carreno only speculates that Sanchez heard the content of the conversation between Pineda and Carreno and, as reflected in the Sanchez 302, much of Sanchez's testimony would have been both cumulative and inculpatory.

■ The district court also properly rejected Carreno's request for a "missing witness instruction" advising the jury that it could draw adverse inferences from the government's failure to call Sanchez as a witness. It is well settled that "[a] 'miss-

---

**1.** We note, however, that Carreno could not meet the materiality threshold in any event.

ing witness' instruction is proper only if from all the circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one." *United States v. Bramble*, 680 F.2d 590, 592 (9th Cir.1982) (internal quotation marks omitted). Because there is no evidence that Sanchez's testimony would have supported Carreno, a missing witness instruction would have been improper in this circumstance.

■ Finally, the district court properly declined to admit the Sanchez 302 into evidence on hearsay grounds. Although Carreno vigorously argues that the district court should have admitted the Sanchez 302 under Federal Rule of Evidence 807, the so-called "catch-all exception" to the hearsay rule, the Sanchez 302 is not a proper subject for the Rule 807 exception. Rule 807 requires, among other things, that a statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts" and have "circumstantial guarantees of trustworthiness." FED. R. E VID. 807. Because the Sanchez 302 is cumulative of other evidence, it is not particularly probative. And, far from having "circumstantial guarantees of trustworthiness," the Sanchez 302 is without any particular guarantee of reliability in terms of substantive evidence. Among other things, the Sanchez 302 only described an interview with Sanchez that was translated by one person and summarized by another; Sanchez was not under oath when he gave the interview; and a witness to the Sanchez interview testified that, in his opinion, Sanchez was trying to pass himself off as "a passen-ger that didn't know anything," making the accuracy of the statements underlying the Sanchez 302 even more questionable.

## III. EXPERT TESTIMONY ON THE SUGGESTIBILITY OF CHILD WITNESSES

■ Carreno sought to put on expert testimony regarding the suggestibility of children in order to attack Carlos's testimony regarding Carreno's purported threat. The district court rejected the request on the ground that the proposed testimony lacked factual relevance as required by Federal Rule of Evidence 702 "because there is no relevant proffer to establish the necessity for expert testimony in this matter." In addition, Carreno's counsel had ample opportunity on cross-examination to test Carlos's memory, and he did so quite effectively. Although Carreno makes much of the circumstances surrounding Carlos's belated report of the threat, in the end, his arguments are speculative enough that we cannot say that the district court's exclusion of the expert testimony was outside "the sound discretion of the trial judge, who alone must decide the qualifications of the expert on a given subject and the extent to which his opinions may be required." *United States v. Chang*, 207 F.3d 1169, 1172 (9th Cir.2000).[2]

## IV. SENTENCING ENHANCEMENT FOR CREATION OF SUBSTANTIAL RISK OF INJURY UNDER U.S.S.G. § 2L1.1(b)(5)

■ Carreno challenges the district court's imposition of a sentencing enhancement under U.S.S.G. § 2L1.1(b)(5). He disputes the district court's factual find-

---

2. Because we conclude that the district court did not abuse its discretion by refusing to admit expert testimony on child suggestibility on Rule 702 grounds, we do not reach the district court's alternate grounds for its ruling—that the evidence was also subject to exclusion under Federal Rule of Evidence 403. Likewise, we do not address Carreno's cumulative error claim based on the district court's evidentiary decisions. Because the district court committed no error in this case, harmless or otherwise, the cumulative error doctrine does not apply. *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996).

ings, which we review for clear error, and the district court's application of the guidelines to the facts, which we review for abuse of discretion. *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1038 (9th Cir.2002). Sentencing Guidelines § 2L1.1(b)(5) provides for an increase up to offense level 18, "[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person . . . ." U.S.S.G. § 2L1.1(b)(5). No precise formula undergirds the determination of what constitutes substantial risk. Instead, the district court must look at the facts in context and assess the degree of risk created by the totality of the defendant's conduct. Although this is a close case, we conclude that the district court's factfinding was not clearly erroneous and that, in applying U.S.S.G. § 2L1.1(b)(5), the court appropriately gauged the situation from a holistic viewpoint, carefully evaluating the cumulative effect of the interrelated factors supporting the enhancement.

The district court's decision was not without precedent. Although we have not quantified the degree of risk necessary for a U.S.S.G. § 2L1.1 sentencing enhancement (and decline to do so here), in *United States v. Hernandez–Guardado*, 228 F.3d 1017, 1027–28 (9th Cir.2000), we approved a U.S.S.G. § 2L1.1 sentencing enhancement on similar facts. In that case, the defendant was responsible for transporting one to two passengers in excess of the van's maximum capacity on several occasions and allowing passengers to lie on the floorboards and across the seats unrestrained by seatbelts.

The evidence here goes beyond *Hernandez–Guardado*. For example, as the district court noted, at times during the trip from Texas to California, there were eighteen people in the van even though it only had fifteen seatbelts. The Gomez boys "spent time in and about the floor areas and were not seated." A long trip was made in only three days without substantial breaks. "[T]he drivers traded off in an attempt to make the trip faster," traveling on highways in an "expeditious . . . fashion." At one point in the trip, after failed attempts to get Carreno's attention, a highway patrol officer pulled him over and issued a citation because his high beams were on. Notably, at sentencing, Carreno conceded "that there were safety concerns." There is no question the passengers were subject to risks.

Carreno's piecemeal challenges to the district court's factfinding do not convince us otherwise. For example, Carreno's argument that there was no evidence that he had *knowledge* that the boys slept on the floor ignores the greater context of the district court's inquiry. The issue is whether Carreno recklessly created a substantial risk. Even if Carreno did *not* know the children were sleeping on the floor, his disregard for the location of his young passengers and lack of awareness regarding their positions is itself indicative of recklessness. As the district court put it, Carreno "had an obligation to know" that "the minors spent time in and about the floor areas and were not seated." Similarly, Carreno's argument that taking turns driving is not illegal misses the point. Lawful or not, the drivers' trading off driving responsibility to forego substantive sleep breaks over a long journey bears on whether Carreno's conduct created a substantial risk.[3]

---

3. Carreno makes a passing argument that the district court rested its enhancement decision solely on the disparity between the number of passengers and seatbelts alone. We disagree. In regard to sentencing, the district court stated that "the record should also reflect that the court also relies on the factual statements that are set forth in the PSR for all the rulings that the court has made, in addition to those the court articulated on the record here."

In light of the similarities between this case and *Hernandez–Guardado* and the cumulative effect of the district court's factfinding, we hold, as we did in *Hernandez–Guardado*, that although "[r]easonable minds could differ as to ... the resulting degree of risk," the district court did not abuse its discretion by imposing the sentencing enhancement in this case. *Id.* at 1028.

**AFFIRMED.**

The district court appropriately rested its enhancement on the totality of the evidence,

including the findings of fact discussed here.