12 F.3d 1109
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff, Appellee,
v.
Roger DURR, Defendant, Appellant.
 No. 90-50486.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 1, 1993.
Decided Nov. 19, 1993.
 
 Before: FLETCHER, NORRIS, and PREGERSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellant Roger Durr was convicted of one count of distribution of phencyclidine in violation of 21 U.S.C. Sec. 841(a)(1). He was sentenced to 240 months. Durr now appeals his conviction and his sentence, asserting that he was denied effective assistance of counsel. We affirm.
 
 I. BACKGROUND
 A. Factual Background
 
 3
 The following facts are not in dispute. On December 14, 1987, a man calling himself "Roger" arranged to sell half a gallon of phencyclidine ("PCP") to two agents of the United States Drug Enforcement Agency (DEA). The man, driving a distinctive gold van registered to Roger Durr, met the agents in a McDonald's parking lot. The three men conferred in Durr's van, where the PCP dealer wrote the name "Rodger" and two telephone numbers on a slip of paper for the agents to facilitate future contacts. After spending a few minutes partaking fast food inside McDonald's, the agents and "Roger" were joined in the parking lot by two acquaintances of "Roger," who drove up and gave an apple juice jar filled with PCP liquid to "Roger." "Roger" sold the PCP to the DEA agents for $3200, then drove away in Roger Durr's distinctive gold van.
 
 B. Procedural Background
 
 4
 Two years and two months later, on February 13, 1990, a federal grand jury indicted Roger Durr and Diane Taylor, the woman who had introduced the agents to "Roger." They were charged with conspiracy to possess and distribute PCP, possession with the intent to distribute PCP, and distribution of PCP. The district court appointed counsel for Durr at his arraignment on March 5, 1990.
 
 
 5
 On May 1, 1990, a new appointed attorney replaced Durr's original attorney. Then on June 5, 1990, a superseding information alleging distribution of one gallon of PCP was filed against Durr alone. Taylor played no further part in the proceedings against Durr.
 
 
 6
 At trial, Durr's counsel challenged the government's proof that the man who called himself "Roger" and sold PCP from Roger Durr's van was in fact the defendant, Roger Durr. During the 30 months between the PCP transaction and the trial, neither of the undercover agents made notes describing the PCP dealer in detail. Thus, when Special Agent ("SA") Philip Jefferson testified that he was certain Roger Durr sold him the PCP 30 months before, Jefferson could remember nothing about the dealer on that day except that he was a black man with a beard about six feet two inches tall who weighed about 200 pounds. The note bearing phone numbers and the name "Rodger" spent sixteen days in SA Jefferson's pocket and desk drawer before he stored it as evidence, and it was never fingerprinted or tested. SA Jefferson could not remember calling the phone numbers on the note or ascertaining the identity of the listed holders of the numbers. When the government's handwriting expert, Karen Chiarodit, compared the note to exemplars of Durr's handwriting, she could not conclusively say that Durr and no other person wrote the note, but she said she saw "very strong evidence" that the same person wrote both samples.
 
 
 7
 Durr's trial counsel challenged the government's identification of Durr during cross-examination of SA Jefferson and Handwriting Expert Chiarodit. Under cross-examination, SA Jefferson revealed that in "approximately March," three or four months after the transaction, he viewed a picture of Durr at the Los Angeles Police Department ("LAPD"). He was shown a single picture, not a photo array, and at the time he identified Durr as the PCP dealer from that photo.
 
 
 8
 Durr's trial counsel then endeavored to establish an alibi through two defense witnesses. One, Delois Alvarez, a family friend of Durr, testified that she saw Durr at a party at her mother's house, from midday to evening, one or more days before December 15, 1987, possibly on December 14, the day of the transaction.[1]
 
 
 9
 A cousin of Durr's, Glen Dear, testified that Durr had given the gold van to another cousin, Carolyn MacIntosh, around the time of the PCP transaction. Dear said he had seen her driving the van and had not seen Durr driving it from around 1987.
 
 
 10
 Durr's counsel at trial stipulated to the truth of the government chemist's report on the contraband. The report stated that the PCP had remained under seal until testing. The chemist reported finding 1,835 milliliters of PCP liquid containing 179.8 grams of PCP.
 
 
 11
 Durr's trial counsel also raised no objection to the facts contained in the Presentence Report, and did not challenge the sufficiency of a prior conviction for selling PCP noted in the Presentence Report.
 
 
 12
 The jury returned a verdict of guilty. Because the amount of PCP exceeded 100 grams and because Durr's record included a prior conviction for trafficking in narcotics in 1985, his offense carried a statutory mandatory minimum sentence of 240 months under 21 U.S.C. 841(b)(1)(A)(iv). That exceeded the Sentencing Guidelines range of 168 to 210 months, so the judge imposed the mandatory 240 month sentence.
 
 
 13
 Durr now appeals, asserting that his trial counsel was so ineffective that he was denied his Sixth Amendment right to assistance of counsel. He asserts that trial counsel fell below objective standards of competence when she: (1) failed to suppress the unreliable identification of Durr by SA Jefferson; (2) failed to exclude the testimony of Handwriting Expert Chiarodit; (3) stipulated to the nature of the contraband, when Durr's sentence depended on the amount of PCP sold; (4) accepted the facts in the Presentence Report and "took no position on sentencing"; and (5) waived all objection to the sufficiency of the prior sentence, which raised the mandatory minimum sentence from 10 years to 20 years.
 
 II. DISCUSSION
 A. Ripeness and Standard of Review
 
 14
 We customarily hear claims of ineffective assistance of counsel in a habeas proceeding after exhaustion of direct review. United States v. Pope, 841 F.2d 954, 958 (9th Cir.1988). But we may consider the merits of such a claim on direct review if the record is sufficiently complete to consider all of the defendant's claims. United States v. Swanson, 943 F.2d 1070, 1072 (9th Cir.1990). Durr has asserted no other grounds for appeal and his claim of ineffective assistance of counsel rests on matters contained in the record, so we consider the claim ripe for review at this time. Because a claim of ineffective assistance of counsel raises mixed questions of law and fact, we review de novo. Id. at 1072.
 
 B. Applicable Law
 
 15
 The Sixth Amendment to the Constitution guarantees that criminal defendants shall have the assistance of counsel. Gideon v. Wainwright, 372 U.S. 335, 344 (1963). The Constitution does not simply guarantee that counsel will be physically present, but that counsel will be effective in mounting a professionally reasonable defense. Washington v. Strickland, 466 U.S. 668, 686 (1984).
 
 
 16
 A defendant claiming that he has been deprived of his constitutional right to effective assistance of counsel must show: (1) that counsel's representation fell below an objective standard of professionally reasonable conduct; and (2) that a "reasonable probability" exists that the deficient performance affected the outcome. Id. at 687-88, 694.
 
 
 17
 In evaluating counsel's performance we must be highly deferential, and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. We avoid second-guessing trial counsel and we defer to counsel's strategic decisions at trial. United States v. Appoloney, 761 F.2d 520, 525 (9th Cir.), cert. denied, 474 U.S. 949 (1985).
 
 
 18
 In evaluating possible prejudice, a "reasonable probability" that counsel's unprofessional errors affected the outcome means a probability sufficient to undermine confidence in the verdict. Strickland, 466 U.S. at 694. A defendant must show more than a conceivable effect, but need not prove that the error more likely than not affected the outcome. Id.
 
 
 19
 C. Was Durr Denied Effective Assistance of Counsel?
 
 
 20
 1. Counsel's Failure to Move for Suppression of Special Agent Jefferson's Identification of Durr
 
 
 21
 Durr claims that his trial counsel fell below professional standards because she failed to move to suppress SA Jefferson's in-court identification of Durr. He asserts that the identification was unreliable, and that SA Jefferson's in-court identification was tainted by the LAPD's suggestive prior presentation of a single photo of an African-American suspect to SA Jefferson.
 
 
 22
 We need not discuss whether counsel fell below an objective standard because we find that no prejudice resulted from failing to move for suppression. Id. at 697 (court may consider prejudice first and avoid issue of attorney competence). To determine whether failing to make the motion to suppress prejudiced Durr, we must first determine if such a motion would have had a reasonable probability of success.
 
 
 23
 a. Reliability of In-Court Identification
 
 
 24
 We have found identifications that result from observations of trained professionals conducting an investigation highly reliable. United States v. Dring, 930 F.2d 687, 692 (9th Cir.1991), cert. denied, 113 S.Ct. 110 (1992); United States v. Hernandez-Valenzuela, 932 F.2d 803, 804-05 (9th Cir.1991). In general, we test reliability of in-court identification though a five-part test, evaluating: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Dring, 930 F.2d at 692-93; Neil v. Biggers, 409 U.S. 188, 200-01 (1972). The primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." Neil, 409 U.S. at 199.
 
 
 25
 In the present case, three of the five factors weigh strongly for a finding that the identification was reliable. SA Jefferson had a greater opportunity to view the criminal than the witnesses in similar cases when he met "Roger" face-to-face in the van, in the sunlit parking lot, and in a brightly lit McDonald's (factor one). By contrast, although the witness in Neil saw her rapist at night by a light through a doorway and by moon, and the customs agents in Dring viewed a criminal while conducting surveillance of a pier at night, both identifications were deemed reliable. Neil, 409 U.S. at 200; Dring, 930 F.2d at 693.
 
 
 26
 SA Jefferson was highly attentive during the transaction because he was consciously gathering evidence for the apprehension of "Roger" (factor two). See Dring, 930 F.2d at 693 (observations of trained professionals conducting investigation reliable). In addition, SA Jefferson felt certain of his identification of the LAPD photo (factor four).
 
 
 27
 Two factors weaken the reliability of the identification. SA Jefferson failed to record a detailed description of "Roger" after the transaction (factor 3), and about four months passed before SA Jefferson identified Durr on the basis of his photo (factor 5). However, SA Jefferson's vague but generally accurate description of "Roger" presents less of a danger of misidentification than the failure of the customs agents in Dring to notice that their suspect had a beard. And the passage of four months is less than the seven-month period preceding the nonetheless reliable identification in Neil.
 
 
 28
 In light of our confidence in the identifications that result from trained professionals conducting a criminal investigation, we hold that a district court balancing the five factors would not exclude SA Jefferson's testimony as unreliable.
 
 
 29
 b. Taint From the Prior Viewing of the Photograph
 
 
 30
 Durr emphasizes that a witness's in-court identification of a defendant may become unreliable if the witness has previously been presented with a photograph of the defendant under suggestive circumstances. Simmons v. United States, 390 U.S. 377, 383-84 (1968).
 
 
 31
 SA Jefferson had spent a considerable period of time conducting business face-to-face with "Roger" and presumably still had a clear mental impression of him four months later. We have no reason to suspect that when viewing the photo SA Jefferson was under undue pressure to confirm that Roger Durr was "Roger." Based on the facts of this case, showing SA Jefferson a single photo of the registered owner of the van used in the drug transaction did not present a very substantial risk of irreparable misidentification. See id. at 385 (FBI showing of several group photos, each containing image of bank robbery suspect, did not create a substantial risk of misidentification because the witnesses separately viewed the photographs and they had a fresh memory of the bank robber seen the day before).
 
 
 32
 c. Durr's Scars
 
 
 33
 In his reply brief, Durr asserts that by failing to point out that extensive burn scars on Durr resulted from an accident occurring some time after the transaction, trial counsel permitted the jury to incorrectly infer that SA Jefferson could easily identify Durr by his distinctive scars. Although Durr may not raise this argument in a reply brief where the government has no opportunity to respond, we have sufficient information to address it. Durr's brief omits the fact that the scars resulted from the explosion of a PCP lab, which Durr admits to have operated in a residential neighborhood. The explosion and fire destroyed two residential garages and severely burned Durr and one other person. Trial counsel could reasonably have made the strategic decision not to raise the issue of the burn scars to insure that the jury not hear the extremely prejudicial details of the source of the burns.
 
 
 34
 2. Failure to Exclude the Testimony of Handwriting Expert Chiarodit
 
 
 35
 Fed.R.Evid. 702 authorizes the court to admit testimony of qualified experts when it will "assist the trier of fact to understand the evidence or determine a fact in issue." Durr asserts two grounds for excluding Chiarodit's expert testimony identifying Durr's handwriting: first, she was unqualified, and second, her testimony had no relevance because it was inconclusive.
 
 
 36
 Durr asserts that Chiarodit's lack of a professional certificate made her unqualified to testify. He omits to mention that Chiarodit had over 10 years experience analyzing handwriting for the LAPD, had trained with the LAPD, FBI and the Secret Service, belonged to numerous professional organizations, and had testified as an expert witness 91 times in federal and state courts. She was qualified. A motion to exclude her as unqualified would have been futile.
 
 
 37
 As to the relevance of Chiarodit's testimony, the Federal Rules define relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence ... more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Chiarodit did not simply testify that her results were "inconclusive." She testified that she had initially reported inconclusive findings after comparing the note with an exemplar obtained from Durr while his hands were severely burned and he had difficulty writing. Chiarodit later obtained DMV records signed by Durr before the fire, and found "strong evidence" that Durr wrote the note. Because the note contained few letters, she still characterized her findings as "inconclusive," but she did not believe any person other than Durr wrote it. In addition, in cross examination she elaborated on the similarity between most of the letters in the two documents. Because Chiarodit's testimony increased the likelihood that Durr wrote the document, her testimony also increased the likelihood that Durr sold the PCP to SA Jefferson, and therefore the testimony was relevant under the Rules.
 
 
 38
 3. Trial Counsel's Stipulation to the Nature and Amount of the Contraband
 
 
 39
 At trial, Durr's counsel stipulated to the truth of the government chemist's report. According to the report, the apple juice jar held 1,835 milliliters of liquid, containing 179.8 grams of pure PCP. Durr contends that in stipulating to the report his trial counsel unnecessarily conceded an element of the government's case and invited the mandatory twenty-year sentence for selling more than 100 grams of PCP in a second narcotic conviction. He argues that the stipulation was unnecessary and served no strategic purpose because challenging the report involved no risk.
 
 
 40
 But he is wrong. Challenging the report would involve risk. It would allow the government to put a forensic chemist on the stand; she would likely be an experienced, impressive witness. The government could elicit details of her laboratory procedures to underscore the dangers of handling PCP. In addition, an independent laboratory report secured by Durr might simply confirm the government's analysis or even find a greater quantity of PCP, compounding the evidence against him. To reduce Durr's minimum sentence, the government chemist's estimate of 179.8 grams would have to be off by 80 grams. Durr offers no reason that trial counsel should have suspected such gross inaccuracy in the report. We defer to trial counsel's strategic choice to accept the report as accurate and to curtail further expert testimony against her client.
 
 
 41
 4. Counsel's "Waiver" of Right to Take a Position On Sentencing
 
 
 42
 Durr asserts that his trial counsel failed to take a position on sentencing when she made no challenge to the factual accuracy of the Presentence Report. But trial counsel did take a position on sentencing. She asked the district court to exercise its discretion in her client's favor by making Durr's new sentence concurrent with his state sentence. The district court did so, saving Durr about seven years in prison.
 
 
 43
 Durr does not allege any factual inaccuracies in the Presentence Report. Only one fact in the report contributed to the 240 month sentence: the previous conviction, which was beyond challenge (see below). Since the Sentencing Guidelines range fell below the statutory minimum sentence, any challenge aimed at further reducing the Guidelines range would have been meaningless.
 
 
 44
 5. Counsel's "Waiver" of Objection to the Sufficiency of Durr's Prior Conviction
 
 
 45
 Durr contends that his attorney should have argued that Durr's prior conviction was not "final" for sentencing purposes at the time of the transaction. The district court may enhance a sentence for a prior conviction only if that conviction was final at the time the defendant committed the charged crime. 21 U.S.C. Sec. 841(b). We have held "that a prior state conviction for which the time to appeal has expired ... is final for purposes of federal sentencing enhancement under Sec. 841(b)(1)B." United States v. Guzman-Colores, 959 F.2d 132, 135 (9th Cir.1992). On December 2, 1985, in a California state court, Durr pled guilty to possession and sale of PCP. He was convicted and sentenced to state prison. Then he was released on parole on September 17, 1987, approximately two months before the DEA transaction. California's 60-day period for filing notice of appeal expired in February, 1986, nearly two years before the transaction. California Civil & Criminal Rules 2, 45(c) (West 1981 & Supp. 1993).
 
 III. CONCLUSION
 
 46
 Durr has identified no specific acts of incompetence by his trial counsel that contributed to his guilty verdict or to the enhancement of his sentence. We therefore find that he received effective assistance of counsel at trial.
 
 
 47
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 In his statement of facts, Durr's appellate counsel contends Alvarez "saw Appellant at a big gathering at her mother's house on December 14, 1987--the day of the crime." DOB, p. 6 (emphasis added). This characterization of Alvarez's testimony is inaccurate; her testimony was too vague to establish alibi. T.R. p. 189, 195