IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-286

Filed 21 January 2026

Johnston County, No. 22CR053063-500

STATE OF NORTH CAROLINA

v.

RICHARD D. BRASWELL, Defendant.

Appeal by Defendant from judgment entered 7 October 2024 by Judge W. Taylor Browne in Johnston County Superior Court. Heard in the Court of Appeals 16 October 2025.

*Attorney General Jeff Jackson, by Assistant Attorney General Reginaldo E. Williams, Jr., for the State.*

*Gammon & Zeszotarski, PLLC, by Joseph E. Zeszotarski, Jr., for Defendant-Appellant.*

CARPENTER, Judge.

Richard D. Braswell ("Defendant") appeals from judgment entered after a jury found him guilty of one count of taking indecent liberties with a child. On appeal, Defendant argues the trial court erred by allowing the State to introduce evidence of the accusing witness's good character for truthfulness and admitting an officer's statements improperly vouching for the accusing witness's credibility. After careful review, we vacate the trial court's judgment and remand for a new trial.

On 1 August 2022, a Johnston County grand jury indicted Defendant for one count of taking indecent liberties with a child. On 23 September 2024, Defendant's

case proceeded to trial, and the evidence tended to show the following.

P.B. ("Penny") and her twin brother, Paul, (collectively, the "Twins")[1] were born in December 2008 and lived with their grandparents for most of their childhood. The Twins' mother had substance abuse issues and was incarcerated several times, whereas their father, who did not live with the family, struggled with alcoholism. Although Penny and her father "weren't the closest," Penny "loved [her] dad." Penny and Defendant's daughter, Kate, were best friends. Through her friendship with Kate, Penny became close with Defendant and his wife.

After the Twins' father took his own life in 2018, the Twins began spending more time with Defendant's family. Eventually, Penny came to think of Defendant and his wife as "second parents." Defendant and his wife "cared" for the Twins and "took [them] places," including Defendant's beach house, church, and family vacations. The Twins also spent Christmas with Defendant's family and regularly received gifts from Defendant. Defendant told Penny he planned to put a house in her name. Defendant also told Paul that he planned to put eight acres of land in Paul's name.

Penny was a cheerleader and ran track with Kate. Defendant often attended Penny's cheerleading events and the girls' track meets and award ceremonies. After track meets, Defendant occasionally gave Penny and Kate calf massages. On one

---

[1] Pseudonyms are used to protect the identifies of the minor children and for ease of reading. *See* N.C. R. App. P. 42(a).

occasion, Defendant massaged Penny's calves while she was at the beach with Defendant's family. Defendant also massaged Penny's thighs at his beach house— once in the living room and once in his bedroom in Paul's presence. Penny did not think Defendant's calf massages were unusual but "knew something wasn't right" when Defendant massaged her thighs.

When Penny was approximately twelve, she started working in the office at Defendant's RV park. Paul also occasionally performed "outside work" at the RV park. Defendant's older daughter, Amanda, regularly worked at the RV park. On 18 April 2022, while Penny was working at the RV park, Defendant asked Penny to meet him in the conference room. At the time, Paul was outside "bush hogging." Amanda was not working that day.

According to Penny, once she and Defendant were alone and seated at the table in the conference room, Defendant "told [Penny] to put [her] legs on his legs." After Penny did so, Defendant began massaging Penny's calves then moved his hands to Penny's thighs. While massaging Penny's thighs, Defendant "got close, pretty close, very close" to Penny's vagina. Then, Defendant unbuttoned and unzipped Penny's pants and "went under [her] underwear." Defendant touched the outside of Penny's vagina with his fingers. Penny did not know what to do but "knew it was wrong." Defendant asked Penny if "it felt good," but she did not respond. Defendant stopped touching Penny when she said she had to go to the bathroom. When Penny came out of the bathroom, Defendant told Penny that "he wanted [her] to experience this

because [her] dad wasn't here to let [her]."

Later that day, Defendant took the Twins home. At first, Penny did not tell anyone about the inappropriate touching; instead, she "tried to act like it didn't happen." Penny was concerned that if she told someone about the inappropriate touching, "they wouldn't believe [her]." Penny tried to avoid being alone with Defendant but rode in the car with him from his beach house during Memorial Day weekend. Before travelling back to Johnston County, Defendant and Penny drove to pick up Paul from a friend's house. At that time, Defendant again massaged Penny's thighs.

A few months later, on 5 June 2022, Penny disclosed the improper touching to a friend during a birthday party at Defendant's house. Earlier that day, the Twins attended church with Defendant and his family. After church, everyone gathered at Defendant's house to eat and swim in the neighborhood pool. Penny changed into her bathing suit upstairs then joined Kate in Defendant's bathroom. When Penny and Kate began to exit the bathroom, Defendant stood in the doorway, and Penny felt "traumatized all over again." Penny entered the living room and informed her friend, Mia, that Defendant had "touched [her] inappropriately" in the conference room at the RV park. Mia told Penny that she should tell Kate and Defendant's wife what happened.

Penny informed Kate first, then Defendant's wife with Kate present. Penny, Kate, Mia, and Defendant's wife all cried. Afterward, Penny went to the pool with

her friends for a few minutes before Defendant's wife took the Twins home. When they got home, Penny told her grandmother about the inappropriate touching at the RV park. Penny's grandmother called their pastor, Dennis Pollock, who arrived at the house to "pray[] over" everyone. The next morning, Penny went to the Johnston County Sheriff's Office with Paul and her grandparents to report the inappropriate touching.

Detective Meredith Langston interviewed Penny. Subsequently, Detective Langston and Major Jeff Caldwell interviewed Defendant. During his interview, Defendant denied touching Penny inappropriately. Detective Langston interviewed Penny a second time on 8 June 2024. On 24 June 2024, Penny provided a written narrative describing her version of events to the Johnston County District Attorney's Office.

Later that month, Penny visited the TEDI Bear clinic for a forensic interview and physical examination. Kendall Maready, a nurse practitioner admitted as an expert "in the area of family nurse practitioning and child medical evaluations," testified regarding Penny's visit to the TEDI Bear Clinic. Maready opined that Penny's presentation was consistent with child sexual abuse.

On Penny's cross-examination, Defendant challenged her credibility by pointing out inconsistencies in her trial testimony, interviews, and written narrative. Defendant also emphasized Penny's delayed disclosure and questioned whether Penny was upset with Defendant for reporting that Penny's mother was using drugs

in violation of her probation. Based on Defendant's impeachment of Penny, the trial court allowed the State to present evidence of Penny's good character for truthfulness. Thereafter, five of the State's witnesses, including Kate, Mia, Pastor Pollock, Defendant's wife, and Student Pastor Stephen Braswell, testified as to Penny's good character for truthfulness. The jury found Defendant guilty of one count of taking indecent liberties. The trial court sentenced Defendant to between twenty and thirty-three months in custody of the Department of Adult Correction. Defendant gave oral notice of appeal in open court.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. §§ 7A-27(b)(1) and 15A-1444(a1) (2023).

## III. Issues

The issues are whether the trial court erred by allowing the State to introduce evidence of Penny's good character for truthfulness and admitting an officer's statements improperly vouching for Penny's credibility.

## IV. Analysis

Defendant asserts the trial court erred by allowing five of the State's witnesses to testify regarding Penny's good character for truthfulness because Defendant did not open the door to this testimony. Defendant argues his impeachment of Penny, which included scrutiny of Penny's prior inconsistent statements and an attempt to

expose Penny's potential bias toward Defendant, was not an attack on Penny's character for untruthfulness. We agree.

"The trial court's decision to exclude or admit evidence is generally reviewed under an abuse of discretion standard of review." *State v. Morgan*, 183 N.C. App. 160, 168, 645 S.E.2d 93, 100 (2007) (citing *State v. Hyatt*, 355 N.C. 642, 662, 566 S.E.2d 61, 74 (2002)). " 'An abuse of discretion results only where a decision is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Black*, 197 N.C. App. 731, 733–34, 678 S.E.2d 689, 691 (2009) (quoting *Clark v. Sanger Clinic, P.A.*, 175 N.C. App. 76, 84, 623 S.E.2d 293, 299 (2005)). An abuse of discretion may occur where the trial court "acts under a misapprehension of law." *Cash v. Cash*, 284 N.C. App. 1, 7, 874 S.E.2d 653, 658 (2022) (citing *Riviere v. Riviere*, 134 N.C. App. 302, 307, 517 S.E.2d 673, 676 (1999)).

In general, the term "impeachment" refers to "an attack upon the credibility of a witness." *State v. Anderson*, 88 N.C. App. 545, 548, 364 S.E.2d 163, 165 (1988). " '[T]he primary purpose of impeachment is to reduce or discount the credibility of a witness for the purpose of inducing the jury to give less weight to [her] testimony in arriving at the ultimate facts in the case.' " *Hill v. Boone*, 279 N.C. App. 335, 347, 865 S.E.2d 722, 729 (2021) (quoting *State v. Bell*, 249 N.C. 379, 381, 106 S.E.2d 495, 498 (1959)). Impeachment is a powerful tool, particularly in cases that turn on a witness's credibility, because skillful impeachment of the complaining witness could sway the jury.

Litigants have a variety of options to impeach a witness. For example, our Rules of Evidence allow: reputation or opinion evidence of a witness's character for untruthfulness; inquiry on cross-examination into specific conduct if probative of untruthfulness; and evidence of prior convictions involving felonies and crimes of dishonesty. *See* N.C. Gen. Stat. § 8C-1, Rules 608(a), 608(b), & 609 (2023). Litigants may question a witness's perception of relevant events by highlighting issues with their memory or sensory capabilities. *See State v. Williams*, 330 N.C. 711, 720, 412 S.E.2d 359, 364–65 (1992); *see also Anderson*, 88 N.C. App. at 548, 364 S.E.2d at 165 (explaining impeachment "is accomplished by such methods as showing . . . defective ability to observe, remember, or recount the matter about which the witness testifies"). Similarly, scrutinizing a witness's prior inconsistent statements and suggesting bias are permissible means to attack credibility. *See* N.C. Gen. Stat. § 8C-1, Rules 610 & 613 (2023); *see also Anderson*, 88 N.C. App. at 548, 364 S.E.2d at 165. Finally, other methods of impeachment may be implicitly permitted by our Rules. *See* N.C. Gen. Stat. § 8C-1, Rule 607 (2023) ("The credibility of a witness may be attacked by any party, including the party calling him."); *see also* N.C. Gen. Stat. § 8C-1, Rule 611(b) (2023) ("A witness may be cross-examined on any matter relevant to any issue in the case, including credibility.").

Not all attacks on credibility, however, trigger rehabilitative evidence of a witness's character for truthfulness under Rule 608(a)(2). *See* N.C. Gen. Stat. § 8C-1, Rule 608(a)(2) (2023). Rule 608(a)(2) provides, in pertinent part, that "evidence of

truthful character is admissible only after the *character of the witness for truthfulness* has been attacked by opinion or reputation evidence or otherwise." *Id.* (emphasis added). Put differently, litigants are restricted from presenting evidence of a witness's character for truthfulness until that witness's character for untruthfulness, not their credibility in general, has been attacked. *See id.* "Character is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty . . . ." *State v. Baldwin*, 125 N.C. App. 530, 536, 482 S.E.2d 1, 5 (1997) (internal quotation marks and citation omitted). Therefore, we first examine which impeachment methods implicate a witness's character for untruthfulness and which ones do not.

While not controlling, federal case law interpreting and applying Rule 608(a)'s federal counterpart is instructive on the difference between attacks on credibility that challenge a witness's character for untruthfulness and those that do not—an issue our courts have yet to thoroughly address.[2] *See, e.g., State v. Wilson*, 322 N.C. 117, 132, 367 S.E.2d 589, 598 (1988) ("Since the case law concerning collateral statements under this rule of evidence in this State is negligible, we shall look to the federal courts for guidance on this point in interpreting its federal counterpart."); *E. Bay Co.,*

---

[2] The Official Commentary to Rule 608(a) states "[t]his rule is identical to Fed. R. Evid. 608, except for the addition of the phrase 'as provided in Rule 405(a)' to subdivision (a)." N.C. Gen. Stat. § 8C-1, Rule 608(a) cmt. Indeed, Rule 608(a) is substantially the same as Rule 608(a) of the Federal Rules of Evidence. *Compare* N.C. Gen. Stat. § 8C-1, Rule 608(a), *with* Fed. R. Evid 608(a). Fed. R. Evid. 608(a) provides, in pertinent part, that "evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked." Fed. R. Evid. 608(a).

*Ltd. v. Baxley*, 296 N.C. App. 444, 450, 909 S.E.2d 533, 536 (2024) ("When this Court reviews an issue of first impression, it is appropriate to look to decisions from other jurisdictions for persuasive guidance.") (citing *Skinner v. Preferred Credit*, 172 N.C. App. 407, 413, 616 S.E.2d 676, 680 (2005)).

In drawing the distinction, federal courts analyze whether the attack on credibility was "indirect" or "direct." *See United States v. Dring*, 930 F.2d 687, 691 (9th Cir. 1991); *see also Renda v. King*, 347 F.3d 550, 554 (3d Cir. 2003). Impeachment methods challenging a witness's "*general character* for truthfulness"—that is, methods tending to show that the witness is a liar in general—constitute "indirect" attacks that trigger rehabilitative evidence under Rule 608(a)(2). *See Dring*, 930 F.2d at 691 (emphasis added). This is because such impeachment evidence "require[s] the jury to infer that the witness is lying at present simply because he has lied often in the past." *King*, 347 F.3d at 550 (explaining indirect attacks "directly call into question the witness's moral character for truthfulness"). For example, opinion or reputation evidence of a witness's character for untruthfulness elicited under Rule 608(a) constitutes an attack sufficient to warrant rehabilitative evidence. *See* N.C. Gen. Stat. § 8C-1, Rule 608(a). Likewise, impeachment evidence elicited under Rule 609 qualifies as an attack on a witness's character for untruthfulness because "[t]he premise behind [this] rule is that a witness who has previously been convicted of a felony, or a crime involving dishonesty or a false statement, is more likely to lie than is a person with a spotless past." *United States v. Norton*, 26 F.3d

240, 243 (1st Cir. 1994).

On the other hand, impeachment methods challenging whether the witness is being truthful "*in the instant case*" constitute "direct" attacks that do not automatically trigger rehabilitative evidence. *Dring*, 930 F.2d at 691 (emphasis added). For instance, pointing out inconsistencies in prior statements does not qualify as an attack on a witness's character for untruthfulness. *See, e.g., State v. Aguilar*, 292 N.C. App. 596, 604, 898 S.E.2d 914, 920 (2024) (determining that defense counsel's impeachment methods, which included pointing out inconsistent statements, did not implicate Rule 608(a)); *State v. Caballero*, 383 N.C. 464, 479, 880 S.E.2d 661, 671 (2022) (determining that pointing out inconsistencies in prior statements does not trigger rehabilitative evidence under Rule 608(a)). This is because pointing out inconsistencies in prior statements implies that the witness is mistaken or misrepresenting the facts of the instant case—not that they are a liar in general. *See Dring*, 930 F.2d at 691–92.

Our Courts have not yet addressed evidence or questions concerning bias in this context. Nevertheless, we conclude a suggestion of bias, like a suggestion that the witness has been inconsistent regarding the facts of the case, does not constitute an attack on the witness's character for untruthfulness. Instead, such evidence tends to imply the witness is being untruthful because she has a reason or motivation to lie—not that she is a liar in general. *See Dring*, 930 F.2d at 691 ("[E]vidence of a witness's bias for or against a party in the instant case, or evidence of a witness's

interest in the outcome of the instant case, constitutes a direct attack that does not trigger rehabilitation under Rule 608(a)[] . . . [because] [s]uch evidence directly undermines the veracity and credibility of the witness in the instant case . . . ."). The Official Commentary to North Carolina Rule of Evidence 608(a) supports our conclusion. The Commentary clarifies that:

> Opinion or reputation that the witness is untruthful specifically qualifies as an attack under the rule, and evidence of misconduct, including conviction of crime, and of corruption also fall within this category. Evidence of bias or interest does not. Whether evidence in the form of contradiction is an attack upon the character of the witness must depend upon the circumstance.

N.C. Gen. Stat. § 8C-1, Rule 608 cmt. (citing McCormick §49; 4 Wigmore §§ 1106, 1107).

In sum, a party only opens the door to rehabilitative testimony concerning a witness's good character for truthfulness if he employs an impeachment method attacking the witness's character for untruthfulness—*i.e.*, a method implicating the witness as a liar in general. *See* N.C. Gen. Stat. § 8C-1, Rule 608(a). Opinion or reputation evidence of a witness's character for untruthfulness and any "other" impeachment method attacking a witness's character for untruthfulness qualifies under this Rule. *See id.* (providing rehabilitative evidence is only admissible after the witness's character for untruthfulness "has been attacked by opinion or reputation evidence *or otherwise*") (emphasis added). Were we to hold differently, any attack on credibility aside from opinion or reputation evidence of a witness's

character for untruthfulness under Rule 608(a) would result in rehabilitative evidence bolstering the witness's good character for truthfulness. *See id.* Instead, the key consideration is whether the impeaching party suggested that the witness is lying or mistaken about the instant case or is a liar in general. *See Dring*, 930 F.2d at 691. The distinction is narrow, but decisive.

Here, Defendant challenged Penny's credibility by pointing out certain inconsistencies between her trial testimony and prior statements. For example, Defendant suggested that Penny had been inconsistent regarding why she ultimately disclosed the inappropriate touching. Defendant also highlighted certain details in Penny's testimony that she failed to disclose during her interviews with Detective Langston and the TEDI Bear clinic. Additionally, Defendant attempted to establish Penny's bias against Defendant because Defendant reported Penny's mother to the probation office. Specifically, defense counsel asked Penny:

> **Defense counsel:** Do you remember that in 2022, right around the time of all these things that we're talking about, do you remember that [Defendant] actually found your mom to be using drugs and turned her into probation?
> **Witness:** Yes, sir, but I don't have control over what my mom does.
> **Defense counsel:** And as a result of [Defendant] doing that, your mom wound up going back into prison, right?
> **Witness:** Yes, sir.
> **Defense counsel:** And you were upset about that, weren't you, ma'am?
> **Witness:** I don't remember.
> **Defense counsel:** You don't remember whether you were upset?
> **Witness:** No, sir. She's been in and out so much, I don't

really remember.

The State contends Defendant's impeachment, as a whole, constituted an attack on Penny's character for untruthfulness sufficient to warrant rehabilitative evidence under Rule 608(a)(2). But none of Defendant's impeachment methods portrayed Penny as a liar in general. On the contrary, Defendant's questions concerning Penny's inconsistent statements and failures to disclose certain details implied she was mistaken or lying about the facts of the case. These attacks on credibility do not trigger rehabilitative evidence. *See Caballero*, 383 N.C. at 479, 880 S.E.2d at 671; *see also Aguilar*, 292 N.C. App. at 604, 898 S.E.2d at 920. The same is true for Defendant's questions attempting to establish bias. *See Dring*, 930 F.2d at 691. Thus, Rule 608(a) was not triggered in this case, and the evidence concerning Penny's good character for truthfulness was improperly admitted.

In determining whether to allow the rehabilitative evidence, the trial court considered Defendant's questions about Penny's prior inconsistent statements and the questions about her potential bias, concluding Penny's "character for truthfulness [had been] sufficiently attacked." Defendant also elicited evidence "of a motivation to fabricate," which the trial court reasoned took the impeachment evidence "one step further." The trial court concluded that because Defendant implied Penny was either lying or mistaken about the events in question, evidence bolstering her character for truthfulness was admissible. The trial court's application of what was, in essence, a totality of the circumstances test was not the proper standard to evaluate whether

Defendant attacked Penny's character for untruthfulness.

Further, implying a witness is mistaken or lying about the facts of the case does not automatically trigger rehabilitative evidence under Rule 608(a)(2). *See Dring*, 930 F.2d at 691. As outlined above, the triggering event is impeachment implying the witness is a liar in general. The trial court misapprehended the law because it assessed Defendant's impeachment of Penny in totality and erroneously concluded that credibility attacks implying the witness is lying or mistaken trigger rehabilitative evidence. *See Caballero*, 383 N.C. at 479, 880 S.E.2d at 671; *see also Aguilar*, 292 N.C. App. at 604, 898 S.E.2d at 920. Accordingly, we conclude the trial court abused its discretion by allowing the testimony concerning Penny's character for truthfulness.

Having established the rehabilitative testimony was improperly admitted, we next consider whether Defendant was prejudiced. To establish prejudice, the defendant must demonstrate "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *Aguilar*, 292 N.C. App. at 604, 898 S.E.2d at 920 (citing N.C. Gen. Stat. § 15A-1443(a) (2023)). Defendant argues the improper rehabilitative testimony prejudiced him because the case hinged on Penny's credibility. We agree.

Here, the State's evidence consisted of the testimony of Penny and others given in reliance on Penny's re-telling of the events that transpired at the RV Park. There was no physical evidence of inappropriate touching. After defense counsel called

Penny's credibility into question about the facts of the case, five of the State's witnesses testified that Penny generally had a good character for truthfulness. Kate testified that Penny has a "very strong reputation for truthfulness in the community." Mia testified that Penny "is very truthful, doesn't lie." Pastor Pollock testified that Penny had a "good" reputation for truthfulness. Defendant's wife testified that Penny "is an honest young lady." Finally, Pastor Braswell testified that Penny's "reputation [for truthfulness] is great."

Because Penny's credibility was the central issue in this case, we conclude the rehabilitative testimony was prejudicial. Absent the testimony concerning Penny's good character for truthfulness, there is a reasonable possibility that the outcome of Defendant's trial would have been different. *See Aguilar*, 292 N.C. App. at 604, 898 S.E.2d at 920. Not only did the rehabilitative witnesses include religious leaders and a member of Defendant's own family, but the number of witnesses reinforcing the message that Penny was honest likely had a powerful impact on the jury. Defendant's cross-examination of Penny raised questions as to her credibility, which were diminished by Kate, Mia, Pastor Pollock, Defendant's wife, and Pastor Braswell. *See Aguilar*, 292 N.C. App. at 605, 898 S.E.2d at 921 (citing *State v. Aguallo*, 318 N.C. 590, 599, 350 S.E.2d 76, 82 (1986)). Therefore, we conclude the improper testimony was prejudicial. Accordingly, we vacate and remand for a new trial. Because this issue is dispositive, we do not reach Defendant's remaining argument.

## V. Conclusion

The trial court erred by allowing five of the State's witnesses to testify concerning Penny's general good character for truthfulness because Defendant did not open the door to this testimony. Defendant was prejudiced by the error. We therefore vacate and remand for a new trial.

NEW TRIAL.

Judges HAMPSON and FREEMAN concur.